564 A.2d 1026

## CITY OF PITTSBURGH

v.

BOARD OF PROPERTY ASSESSMENT, APPEALS AND RE-VIEW and Allegheny County Industrial Development Authority (Y.M.C.A. of Pittsburgh) and School District of Pittsburgh, County of Allegheny.

## COUNTY OF ALLEGHENY

v.

## BOARD OF PROPERTY ASSESSMENT, APPEALS AND REVIEW OF ALLEGHENY COUNTY

and

Allegheny County Industrial Development Authority (Y.M.C.A. of Pittsburgh) School District of Pittsburgh, City of Pittsburgh.

ALLEGHENY COUNTY INDUSTRIAL DEVELOPMENT AU-THORITY (Y.M.C.A. of Pittsburgh) and Y.M.C.A. of Pittsburgh

v.

## BOARD OF PROPERTY ASSESSMENT, APPEALS AND REVIEW OF ALLEGHENY COUNTY.

Appeal of the CITY OF PITTSBURGH from the Board of Property Assessment, Appeals and Review County of Allegheny, Commonwealth of Pennsylvania.

Appeal of ALLEGHENY COUNTY INDUSTRIAL DEVELOP-MENT AUTHORITY (Y.M.C.A. of Pittsburgh) and the Y.M.C.A. of Pittsburgh, Appellants.

Commonwealth Court of Pennsylvania.

Argued May 2, 1989.

Decided Sept. 29, 1989.

70

Richard T. Wentley, with him, E.W. Seifert and Amy Acheson, Reed, Smith, Shaw & McClay, Pittsburgh, for appellant, Y.M.C.A. of Pittsburgh.

S. Michael Streib, with him, Leonard M. Mendelson, Hollinshead and Mendelson, Pittsburgh, for appellee, County of Allegheny.

D.R. Pellegrini, City Sol., for appellee, City of Pittsburgh.

Robert A. Mills, with him, Elizabeth A. Dougherty and James L. Fritz, McNees, Wallace & Nurick, Harrisburg, for amicus curiae, Y.M.C.A. of U.S.A.

Stewart M. Weintraub, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, for amicus curiae, American Jewish Congress.

Before CRUMLISH, Jr., President Judge, COLINS, Judge and BARBIERI, Senior Judge.

## OPINION

CRUMLISH, Jr., President Judge.

The Young Men's Christian Association of Pittsburgh (YMCA) appeals an Allegheny County Common Pleas Court order denying a property tax exemption for its facility known as the "Downtown Y."[1] We vacate and remand.

The YMCA applied for exemption from real estate taxation with the Board of Property Assessment Appeals and Review of Allegheny County (Board) for its newly constructed downtown facility; after hearing, the Board granted the exemption. The City of Pittsburgh appealed that decision to the common pleas court which remanded the case to the Board for an additional hearing. The County of Allegheny intervened in the proceeding on remand. The Board subsequently classified approximately eighty-six percent of the "Downtown Y's" tax assessment as exempt and approximately fourteen percent as taxable. On appeal, the common pleas court held that the facility did not function as a "purely public charity" and thus did not qualify to any extent for tax-exempt status.

---

1. The YMCA also appeals an order of the same court which denied its motion for post-trial relief. The YMCA of the USA and the American Jewish Congress have filed amicus curiae briefs on behalf of the Pittsburgh YMCA in this appeal.

Article VIII, Section 2 of the Pennsylvania Constitution provides:

(a) The General Assembly may by law exempt from taxation:

. . . .

(v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.

In accordance with this constitutional authority, the General Assembly enacted The General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. §§ 5020-101—5453-706, which provides in Section 204:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

. . . . .

(3) All ... associations and institutions of learning, benevolence, or charity ... with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereto, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose.

■ In Pennsylvania, to qualify for a real estate exemption under Section 204, the property owner must show that the entire institution (1) is one of purely public charity; (2) was founded by public or private charity and (3) is maintained by public or private charity. *Woods School Tax Exemption Case*, 406 Pa. 579, 178 A.2d 600 (1962).

■ The question of whether a taxpayer is a "purely public charity" is a mixed question of law and fact and the decision of the trial court will not be disturbed absent an abuse of discretion or a lack of supportive evidence. *Council Rock School District v. G.D.L. Plaza Corp.*, 91 Pa.Com-

monwealth Ct. 176, 496 A.2d 1298 (1985), *aff'd*, 515 Pa. 54, 526 A.2d 1173 (1987). In order to qualify as a purely public charity, the entity seeking tax exemption must prove that it (a) advances a charitable purpose; (b) donates or renders gratuitously a substantial portion of its services; (c) benefits a substantial and indefinite class of persons who are legitimate subjects of charity; (d) relieves the government of some of its burden; and (e) operates entirely free from private profit motive. *Hospital Utilization Project v. Commonwealth (HUP)*, 507 Pa. 1, 487 A.2d 1306 (1985).[2] Statutory provisions exempting persons or property from taxation must be strictly construed. *Y.M.C.A. v. Reading*, 402 Pa. 592, 167 A.2d 469 (1961).

The purposes and activities of the YMCA are well known. As stated in its membership policy, the YMCA fosters development of the individual through integration of the spirit, mind and body into a complete whole through services provided to all YMCA members and the community at large (Notes of Testimony (N.T.), 11/14–17/88, p. 447.) The YMCA has historically existed as a non-profit organization devoted to charitable undertakings. That it advances laudable humanitarian purposes as an organization is not determinative, however. The question of tax exemption must inevitably focus on the actual use to which this particular property is put and on the distribution of revenue that may be derived from such use.

The Downtown Y was constructed to replace the deteriorating Wood Street facility, which studies determined was not worthy of renovation. Funds for the new eight-floor facility were obtained from the sale proceeds of the Wood Street building, endowment funds, a capital campaign and a loan secured by a mortgage. The Downtown Y, which began operating in December 1986, provides its members with gyms, an Olympic swimming pool, various types of

---

**2.** The YMCA contends that the *HUP* test does not apply in this, a real estate taxation case. However, *any* entity seeking tax exemption must establish as a threshold requirement under the Pennsylvania Constitution that it is a "purely public charity." *HUP*, 507 Pa. at 13, 487 A.2d at 1312.

exercise equipment, squash, handball and racquetball courts, running tracks, saunas, steam rooms, showers, related health care facilities, a pro shop and other facilities for meetings and other activities. Child care is available and the YMCA's central offices are also located within the building. Members pay dues ranging from the more expensive "gold" and "silver" programs to "student" and "youth" memberships with commensurately lower annual fees. Numerous educational and developmental programs are offered at the facility and are often accompanied by a modest fee.

In its opinion, the common pleas court concluded that the Downtown Y facility does not advance a charitable purpose because it does not devote a substantial portion of its assets to the general public but instead primarily exists to provide facilities and services to its dues-paying members. The court found that only a very small number of Downtown Y members are subsidized by fellow members and that additional uses of the facility by other organizations and the general public are likewise insignificant when compared with dues-paying member use. The court further determined that the primary beneficiaries of the Downtown Y's assets are a small definite membership, a large percentage of whom are businessmen and professionals, not legitimate objects of charity; to the extent that the Downtown Y provided services to the needy, tax funds are provided and thus the facility relieves the government of very little, if any, of its burden; and inasmuch as the Downtown Y exists in competition with other commercial business and child care centers, it is not entirely free of a private profit motive.

The YMCA contends that the trial court's decision contradicts this Commonwealth's well-established constitutional, statutory and decisional law and ignores extensive uncontested evidence produced at trial. It maintains that as a result of the trial court's decision, its long tradition of charitable works are frustrated. The City and County respond that this new and modern facility is properly char-

acterized as a commercial venture no longer serving the general public and therefore not entitled to tax exemption reserved solely for purely charitable institutions.

Our review of the extensive record in this matter reveals that by September 30, 1988, the Downtown Y had 3,199 members; 2,321 persons, approximately seventy-two percent, held either "gold" or "silver" memberships, priced respectively at $600 and $398 per year; 293 student members paid $199 per year and 455 youth members paid $35 annually, leaving 113 individuals who paid little or no membership fees because of economic reasons. (N.T., pp. 105, 130–32; Allegheny County Exhibit No. 2). In order to generate membership, the YMCA implemented aggressive marketing and promotional strategies targeting primarily business and professional people. (N.T., pp. 137–149. *See* Allegheny County Exhibit No. 37, titled "Survey of YMCA New Member Potential.") The YMCA projected cash surpluses of 8,700 in 1988, $121,644 in 1989 and $204,838 in 1990. (Allegheny County Exhibit No. 11.) The record also shows that the nature of the Downtown Y's operation has changed. Dormitory rooms, a traditional feature of YMCA's, are not provided. Further, while it is the YMCA's policy to remain available to everyone, including those who cannot afford even nominal membership fees, it appears that the state-of-the-art exercise facilities of the Downtown Y are made available in a manner virtually identical to competing health and fitness entities.

It is illustrative to contrast the YMCA's present downtown facility with the former Wood Street facility, the tax exemption of which was at issue in *Y.M.C.A. of Pittsburgh Tax Case*, 383 Pa. 176, 117 A.2d 743 (1955). In its per curiam decision, our Supreme Court affirmed on the common pleas court opinion and held the Wood Street facility, one of five YMCA properties, was wholly exempt from real estate taxation. The common pleas court conducted a use-by-use analysis, determining that (1) the renting of dormitory rooms was not a commercial enterprise in that admission was limited primarily to young men of low incomes away

from home who were charged lower fees than those at nearby hotels; (2) food service facilities were reasonably necessary to the charitable purpose in that they were used principally by residents and members, enabled volunteers serving on essential committees to meet and confer at mealtime and they operated at a loss; and (3) a small barber shop, bowling alleys and a businessmen's health club were likewise exempted because they were incidental to the overall operation and occupied a negligible percentage of the total space. The instant facility, on the other hand, provides as a primary function, exercise facilities to fee-paying members. An active day-care program servicing as many as forty-six children is also provided for which fees are also charged. Thus, the common pleas court was correct in observing that the Downtown Y has assumed a more commercial appearance. The court has not, however, adequately determined whether the revenue generated by the commercial activities meets or exceeds costs or whether excess profits are reinvested.

█ While acknowledging the revenues derived from the operation of its exercise facilities, the YMCA asserts that such profitability does not preclude charitable status so long as those revenues are reinvested in the institution. A purely public charity does not cease to be such where it receives some payment for its services. *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968). Effective fund-raising methods are necessary in light of the great costs of maintaining serviceable facilities, costs with which all institutions of charitable intent must contend. In *West Allegheny Hospital v. Board of Property Assessment, Appeals and Review of Allegheny County,* 500 Pa. 236, 455 A.2d 1170 (1982), our Supreme Court likewise noted this financial reality in upholding a real estate tax exemption to a hospital which passed on to its patients approximately eighty percent of amounts billed. As stated therein,

> the word 'charity' as used by the Legislature does not contemplate the requirement that there be only a nominal

charge to beneficiaries. Such a requirement clearly conflicts with the evident intent of the proviso [to Section 204(a)(3)] to accommodate evolving institutional needs in the light of limits to public and private generosity.

*Id.,* 500 Pa. at 243, 455 A.2d at 1173.

The troublesome feature of the YMCA's operation of its downtown facility is not that it charges fees to some members that may approximate or exceed costs or that it provides a modern, sophisticated facility similar to if not more elaborate than commercial fitness centers. The YMCA cannot continue to provide fitness facilities that consist solely of the medicine balls and wrestling mats of bygone days. In order to attract a revenue generating membership, it must maintain a viable public presence which reflects current fitness trends. Nor can the YMCA remain entirely dependent on contribution and nominal fees and expect to survive economically. This is the accommodation of "evolving institutional needs" and "limits of public and private generosity" of which our Supreme Court spoke in *West Allegheny Hospital.*

 The perplexity with which this Court must contend is that the percentage of "gold" or "silver" members is great and may not justify a total tax exemption for this new facility. The common pleas court has not, however, *quantified* the percentages of subsidized and non-subsidized membership or determined whether other income-producing measures, such as the numerous miscellaneous program fees, cover the costs of those programs.[3]

 Thus, in order to answer the question of whether the YMCA operates the Downtown Y as a purely public charity,

---

**3.** That the Downtown Y charges nominal fees for training and educational programs and receives tax funds and United Way funds does not preclude a finding of tax exemption. *West Allegheny Hospital; Hill School Tax Exemption Case,* 370 Pa. 21, 87 A.2d 259 (1952). Furthermore, a charitable institution does not cease to be such merely because receipts may surpass expenditures. *Vanguard School Tax Exemption Case,* 430 Pa. 378, 243 A.2d 323 (1968). Rather, a reviewing court should determine whether any excess inures to private rather than public benefit.

it is necessary to determine to what extent, if any, the dues-paying members subsidize other members and other public benefit programs at that facility, *Vanguard School,* and whether the revenues generated by the Downtown Y significantly subsidize the YMCA's other facilities. In its opinion, the common pleas court narrowly focused on the income-producing aspects of the downtown facility, business features which are no doubt readily apparent in any facility serving the community while attempting to remain financially sound. However, the court's summary conclusion that the proportion of use by public groups is extremely small does not indicate adequate consideration of a significant portion of testimony delineating the facility's extensive public recreational and educational programs.

Although the record indicates that approximately thirty percent of the members are subsidized to some degree (N.T., p. 116), a significant amount of the facility's use is made available to non-members in various sports leagues, swimming programs, day camps, educational programs, programs for the handicapped and other community groups. For example, meeting rooms and other facilities are made available for small fees or free of charge to such groups as the Volunteer Action Center (N.T., p. 338), Catholic Charities (N.T., p. 339), United Way of Allegheny County (N.T., p. 340), the Diocese of Pittsburgh (N.T., p. 340), Pennsylvania State University, Health Education Center, Urban League, Pittsburgh Board of Education, Allegheny County Children & Youth Services, (N.T., p. 341), Special Olympics (N.T., p. 349), Cystic Fibrosis Foundation (N.T., p. 350), the Easter Seals Society, the Boy Scouts of America, Campfire Girls, the City of Pittsburgh Department of Parks and Recreation (N.T., 353–4), etc. Numerous other organizations and institutions also use the facility, often on a routine basis. Based on the sheer volume of use generated by these organizations, we cannot conclude that substantial evidence supports the trial court's finding of an insignificant amount of use by outside or public groups.

■ Accordingly, we vacate the common pleas court's order and remand, with directions to make findings as to the nature and extent of use on each of the Downtown Y's eight floors. Such a use-by-use analysis has been employed by Pennsylvania courts in *Y.M.C.A. of Pittsburgh Tax Case,* and in *Y.M.C.A. of Germantown v. Philadelphia,* 323 Pa. 401, 187 A. 204 (1936), where that portion of the building devoted to commercial renting of dormitory rooms was held subject to real estate tax. We also instruct the court to determine whether the various program fees charged to outside organizations were sufficient to meet the maintenance and operating costs of those programs. The court shall determine whether and to what extent full dues-paying members pay fees greater than the costs associated with their use and whether any excesses are reinvested in the YMCA's general funds. In addition, the court should inquire into and make findings on the rationale for the Board's decision apportioning tax liability. The Board determined that approximately eighty-six percent of the tax assessment was properly exempted, but our review of the record does not disclose any evidence on which that apportionment was made. Based on these findings, the common pleas court is then to determine whether and to what extent the Downtown Y is entitled to tax exemption as a purely public charity.[4]

We recognize the difficulty of the task before the court and the burden on counsel to provide competent evidence on the facility's use and the financial subsidy of public programs. However, we cannot countenance a total denial of the YMCA's previous tax exemption based entirely on the fact that the YMCA now operates modern and competitive fitness oriented and day-care facilities where substantial, uncontroverted evidence exists to indicate that the Downtown Y has not abandoned its traditional role as a provider

---

**4.** We reject the YMCA's contention that the common pleas court's decision constitutes a violation of the constitutional separation of powers doctrine. As has been the case since the origination of the charitable tax exemption, each case is to be analyzed on its own merits.

of humanitarian services and recreational facilities to the general public.

## ORDER

The Allegheny County Common Pleas Court orders, Nos. G.D. 88–2349, G.D. 88–2704 and G.D. 88–3323, dated November 22, 1988, are vacated and this case is remanded in accordance with the foregoing opinion.

Jurisdiction relinquished.