**SELFSPOT, INC., d/b/a The Fitness Factory, Appellants,**

v.

**The BUTLER COUNTY FAMILY YMCA.**

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2009.

Decided Jan. 5, 2010.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

Fred Greenberg, Wallingford, for appellant.

Lawrence P. Lutz, Butler, for appellee.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge McGINLEY.

Selfspot, Inc., d/b/a The Fitness Factory, appeals from the order of the Court of Common Pleas of Butler County (trial

court) after a non-jury trial that ruled in favor of The Butler County Family YMCA (Butler County Y) and dismissed Selfspot's complaint in equity filed pursuant to Section 8 of the Institutions of Purely Public Charity Act (Act).[1]

Selfspot is a small, tax-paying health club located in Seven Fields, Pennsylvania which operates "The Fitness Factory." Butler County YMCA is a purely public charity[2] that owns and operates a new YMCA branch in Cranberry Township, Pennsylvania called the Rose E. Schneider YMCA ("Schneider Y"). The Fitness Factory and the Schneider Y both operate fully equipped "fitness centers" and group exercise programs to members. They serve the same communities and compete with each other, to an extent, for dues-paying members.

The Fitness Factory consists of a fitness center, an aerobics room, a play area for babysitting, a juice bar, tanning beds, locker rooms and a general multi-purpose desk. The Fitness Factory has a primarily adult clientele. Children under 13 are not permitted to use the facilities. Children between the ages of 13–16 may exercise with adult supervision. The Fitness Factory offers weight and strength training, cardiovascular equipment, and group aerobics and spinning classes.

The Butler Y's Charter states that "the purpose for which the corporation is formed is the promotion of the religious, intellectual, social and physical welfare of young men." Charter of the Young Men's Christian Association of Butler, Penna., November 8, 1886, at 1; Reproduced Record (R.R.) at 358a. Its By–Laws state "[t]he Corporation is a group of persons whose objectives shall be the improvement

of the spiritual, mental, social and physical condition of its membership and the community at large." Bylaws of the Butler County Family Young Men's Christian Association, February 24, 1981, at 1; R.R. at 366a. The Butler Y's Articles of Incorporation define its purposes:

1.  To establish and maintain a fellowship rooted in traditional and historical Judeo/Christian principles for the development of healthy spirit, mind and body.

2.  As a community service organization, to put into practice the aforesaid principles through programs as a community service organization, and facilities that promote good health (both physical and mental), strengthening of family ties and values, citizenship, adult and youth leadership, individual awareness and worth, good character, volunteerism, and national and international understanding.

3.  To offer the aforesaid programs to all people of all ages, races, sex, ethnicity, social economic standing, religion or creed and regardless of one's ability to pay.

4.  To act as an Association of members working together to improve the quality of life for adults and children of all income levels of the community.

5.  To operate facilities and provide the necessary equipment throughout the Butler County Family YMCA's service area, including, but not limited to: youth centers, indoor and outdoor swimming pools, gymnasiums, weight training rooms, fitness centers, childcare facilities, sports courts, day camp sites, afterschool childcare sites, playgrounds, ath-

---

1.  Act of November 26, 1997, P.L. 508, 10 P.S. § 378, *as amended.*

2.  It is undisputed that the Butler Y was originally chartered in 1886 and approved as a charitable institution under Section 501(a)(3) of the Internal Revenue Code.

letic fields, educational and community all-purpose rooms.

6. To conduct such charitable and educational activities in furtherance of its duties as contemplated by Section 501(c)(3) of the Internal Revenue Code.

Articles of Incorporation of the Butler County Family Young Men's Christian Association, February 22, 2000, at 1; R.R. at 378a.

On November 4, 2006, the Butler Y opened the Schneider Y. The Schneider Y is an 80,000 square foot facility which, in addition to the fitness center, has a three-court gymnasium, a running track, a chapel, extensive swimming facilities, community meeting rooms, offices, a rock climbing wall, and locker rooms. The Schneider Y offers numerous programs offered to families and people of all ages in the community including childcare, day camp, gymnastics, Healthy Kid Day, health and fitness programs, lifeguarding, personal fitness, sports programs, swim and scuba lessons, CPR and first-aid classes, teen programs, volunteer programs, senior strengthening and fitness programs, and youth programs such as, a Fit Kids Program for children ages 7–13, a youth weight training program for children ages 11–15, cardiovascular training for youths. The Schneider Y also makes its facilities available to various clubs, school districts and other local organizations and community groups.

On January 24, 2000, Selfspot filed a complaint in equity seeking to enjoin the operation of the fitness center (the weight room, aerobics room, and the spinning room) and alleged it was not related to a recognized and approved charitable purpose of the Butler Y in violation of Sections 8(a) and (b) of the Act:[3]

(a) **Intent.**—It is the policy of this act that institutions of purely public charity shall not use their tax-exempt status to compete unfairly with small business.

(b) **General rule.**—An institution of purely public charity *may not fund,* capitalize, guarantee the indebtedness of, lease obligations of *or subsidize a commercial business that is unrelated to the institution's charitable purpose as stated in the institution's charter or governing legal documents.*

10 P.S. § 378(a), (b). (Emphasis added).

Selfspot averred that the Schneider Y's fitness center catered primarily to paying customers. Therefore, this portion of its facility was unrelated to its charitable purpose. Selfspot did not seek to enjoin the entire operation of the Schneider Y; just the areas which offered the same fitness equipment and programs as those offered by the Fitness Factory, namely, the weight and exercise room, the aerobics and spinning classes.

The Butler Y filed Preliminary Objections in the nature of a demurrer. It argued that Selfspot's complaint was an improper request for the trial court to examine whether the Schneider Y's activity of running a fitness center was a proper charitable purpose under Section 5 of the Act, 10 P.S. § 375. According to the Butler Y, the trial court lacked subject matter jurisdiction because only political subdivisions may challenge an institution's tax exempt status under Section 6 of the Act, 10 P.S. § 376(b). The trial court agreed that it lacked jurisdiction and dismissed the complaint.

On February 25, 2003, this Court, sitting *en banc,* reversed the trial court. *Selfspot, Inc. v. The Butler County Family YMCA,*

---

**3.** The Fitness Factory first filed a complaint with the Department of State as required by Section 8(i) of the Act, 10 P.S. § 378(i). The Arbitrator dismissed the complaint and The Fitness Factory appealed to the trial court de novo.

818 A.2d 587 (Pa.Cmwlth.2003) (*en banc*), *appeal denied,* 574 Pa. 756, 830 A.2d 977 (2003) (*"Selfspot I"*). The *en banc* decision addressed a number of issues relating to the validity of a cause of action brought by a small tax-paying health club against a YMCA under the unfair competition provision of the Act. Reviewing *Dynamic Sports Fitness Corp. of America, Inc. v. Community YMCA of Eastern Delaware County,* 768 A.2d 375 (Pa.Cmwlth.2001), *appeal denied,* 568 Pa. 707, 796 A.2d 986 (2002), this Court confirmed that in prosecuting a claim of unfair competition under the Act, a small business may aver, and the court may consider, a claim that a particular activity of a charity, such as operating a commercial health club, is unrelated to any "charitable purpose" as that term is defined in Section 5 of the Act, 10 P.S. § 375:

> **(b) Charitable purpose.**—The institution must advance a charitable purpose. This criterion is satisfied if the institution is organized and operated primarily to fulfill any one or combination of the following purposes:
>
> (1) relief of poverty;
>
> (2) advancement and provision of education (including post-secondary education);
>
> (3) advancement of religion;
>
> (4) Prevention and treatment of disease or injury, including mental retardation and mental disorders;
>
> (5) government or municipal purposes;
>
> (6) accomplishment of a purpose which is recognized as important and beneficial to the public and which advances social, moral or physical objectives.

10 P.S. § 375(b).

This Court agreed with the conclusion of *Dynamic Sports Fitness* that "promotion of health," although no longer an enumerated charitable purpose under Section 5(b), fell within the purpose set forth in subsection (6) and may still be regarded as a charitable purpose if circumstances warrant. This Court, however, disagreed with the panel's analysis of whether the Community YMCA of Eastern Delaware advanced a charitable purpose. Specifically, the Court in *Dynamic Sports Fitness* summarily concluded that any YMCA expansion and operation of its athletic facilities is *per se* related to its charitable mission and purpose of promoting physical health.

The *en banc's* rejection of this approach in *Selfspot I,* was based on two earlier cases *City of Pittsburgh v. Board of Property Assessment, Appeals and Review,* 129 Pa.Cmwlth. 69, 564 A.2d 1026 (1989) and *Appeal of Sewickley Valley YMCA,* 774 A.2d 1 (Pa.Cmwlth.2001). Although those cases involved the tax exempt status of real estate owned by a YMCA, they did involve the issue of whether certain activities offered by the respective YMCA's advanced a "charitable purpose." In those cases, the court focused on the ***actual use*** to which a particular YMCA property was put. For example in *City of Pittsburgh,* the YMCA at issue provided a restrictive health club area that members had to pay a special fee to use. Neither case relied solely on the general sentiment that all YMCA's conventionally advance a charitable purpose.

To correct this generalization in *Dynamic Sports Fitness,* the Court in *Selfspot I* expressly overruled *Dynamic Sports Fitness* "to the limited extent that it held that 'promotion of health' ***is necessarily*** intertwined with the charitable mission of a YMCA, such that a complaining small business cannot state a claim under Section 8 by challenging a YMCA's provision of new or expanded commercial health-club type facilities." *Selfspot I,* 818 A.2d

at 593–594 (Emphasis added). Relying upon *City of Pittsburgh* and *Appeal of Sewickley Valley YMCA,* the *Selfspot I* Court instead held that "a YMCA providing health-club facilities primarily to paying customers in competition with similar small businesses may give rise to a valid claim under the Act." *Selfspot I,* 818 A.2d at 594. Each case must be based on the particular circumstances of the YMCA and its unique situation because all YMCA's are not necessarily the same for Section 8 of the Act, 10 P.S. § 378, purposes.

Accordingly, this Court in *Selfspot I* remanded the case to the trial court to consider evidence of the "precise nature and extent of the uses" of the fitness center. *Selfspot I,* 818 A.2d at 594.

On remand, a second trial judge granted the Butler Y's motion for summary judgment shortly after the case was listed for trial. The trial court relied on the *Selfspot I* holding that "promotion of health" may be a charitable purpose "if circumstances warrant," and it quoted the Butler Y Charter for purposes including "[t]o establish and maintain a fellowship rooted in traditional and historical Judeo/Christian principles for the development of healthy spirit, mind and body." Stating that Section 5(b) of the Act, 10 P.S. § 375(b) confers charitable status if an institution is organized and operated primarily to fulfill one or a combination of the enumerated purposes, the trial court concluded that having a fitness facility on the premises, especially in conjunction with the other programs offered, was directly related to and assisted the charter purpose of developing a healthy spirit, mind and body. Selfspot filed another appeal which was heard by a panel of this Court.

In *Selfspot, Inc. v. The Butler County Family YMCA,* (No. 2006 C.D. 2005, Pa. Cmwlth. slip opinion, filed July 18, 2006) (Selfspot II), a panel of this Court in an unpublished memorandum opinion again reversed and remanded because the trial court's ruling that the YMCA engaged in other charitable activities on its premises, such as child care and tutoring programs and established its charitable nature and its conclusion that a fitness center assisted in charter purposes "[was] no different from the conclusion in *Dynamic Sports Fitness* that the fitness activity was 'necessarily intertwined' with the YMCA's other charitable purposes." *Selfspot II,* at 10. The Court concluded that there were many issues of material fact relating to the precise nature and operation of the proposed fitness center. The *Selfspot II* decision provided some direction to the trial court on the issues to be considered on remand. It "set the threshold standard for unfair competition as whether a YMCA is primarily providing health club type services to paying customers." *Selfspot II,* at 8. This Court directed the trial court to (1) consider the "precise nature and operation of the fitness center," (2) determine whether "significant numbers" of members use the YMCA primarily as a fitness center, and (3) determine whether the YMCA provides "substantial amounts of financial assistance or essentially caters to paying customers." *Selfspot II,* at 11.

■ In the present controversy, during a five day trial, the parties presented extensive evidence, exhibits and lay and expert witness testimony. The trial court visited both the Fitness Factory and the Schneider Y to observe firsthand the layout and operation of the facilities.

As the party bringing the action Selfspot had the burden of proof. There was no dispute that both the Fitness Factory and the Schneider Y offered the same cardiovascular equipment, free weight and strength training equipment, and the same group exercise and personal training classes. There was also no dispute that

the parties draw members from the same geographic area. The parties disagreed, however, to the nature of the use of the fitness center and the role it played in the overall operation of the Schneider Y.

It was Selfspot's position that the vast majority of the Schneider Y's members came from an affluent area; therefore, the entire Schneider YMCA and, consequently, the fitness center, was only used by dues-paying members and the majority of people who participated as members paid the full rate. Selfspot demonstrated through consolidated tax returns for all the Butler County YMCA, Inc.'s (including the Butler Y, the Southwest Butler YMCA and the Schneider Y branches) that a small percentage of members, 7.9%, received financial aid.[4] Notes of Testimony, January 3, 2008, (N.T., 1/3/08), at 129–140; R.R. at 184a–186a. Selfspot attempted to show through tax returns that the Schneider Y's financial aid was *de minimis* in relation to the revenues it generated and the amount of public support it received. Selfspot demonstrated that the Schneider Y had the resources to grant more financial aid than it did.

Larry Garvin (Garvin), President and Chief Executive Officer of the Butler Y, testified that there was no separate fitness center membership. A membership provided members access to the whole facility, including the fitness center, swimming pools, and gymnasium. No person was denied membership or access to the fitness center or any other part of the facility due to inability to pay. N.T., 1/3/08, at 195; Notes of Testimony, January 4, 2008 (N.T., 1/4/08), at 36; R.R. at 200a, 211a. Garvin testified that the fitness center was part and parcel of the entire facility. It was not a separate entity and there was no special fee or privilege to use it. Anyone was able to go in and out. The Schneider Y did not monitor who went in and out of the fitness center. The fitness center, like all other areas in the Schneider Y, was accessible to everyone, including children 11–14 years old. Garvin also explained that the Schneider Y did not keep statistics on the type of usage for each member. There was no way of knowing how many financial aid recipients used the fitness center as opposed to dues-paying members; they received the exact same type of membership card as a dues-paying member. N.T., 1/4/08, at 35; R.R. at 211a.

Garvin also testified that many community organizations and programs utilized the fitness center for a nominal fee or "free of charge," including the Butler Hospital and Health Systems, the Active Aid America Program, the Big Brothers Big Sisters Program, homeschoolers physical education program, and Glade Run Lutheran Home for troubled youth. N.T., 1/3/08, at 192–193; N.T., 1/4/08, at 55–56, 95–97, Notes of Testimony, January 7, 2008, (N.T., 1/7/08) at 50–51–53; R.R. at 199a–200a, 216a, 226a–227a, 262a–263a. He also testified that the Butler Y, which included the Schneider Y, provided $100,000 worth of financial assistance a year. Financial aid was provided based on household income and the number of members in the family. The Schneider Y used the Department of Welfare Financial Guidelines. Assistance was also granted based on non-financial considerations, including problems in the household, and drug and alcohol abuse and domestic issues. N.T., 1/3/08, at 159–160, N.T. 1/4/08, at 13–14; R.R. at 191a, 206a. Garvin testified that the Schneider Y received approximately 126 applications for financial aid

---

4. Financial aid in YMCA parlance refers to a reduction in the amount of membership dues or program fees.

between its opening in November 2006, and April 19, 2007.

David Hilliard, Executive Director of the Schneider Y, described other groups who used the facility and fitness center free of charge, including Christian Hockey International, preschool cheerleading, Butler County Autism Society, local schools, Boy Scouts, and Girl Scouts. N.T., 1/7/08, at 129, 138, 148–149; R.R. at 282a, 284a, 286a–287a. He testified that when the Schneider Y was "packed" the whole facility was packed, including the swimming area, the gymnasium and the fitness center.

In a 66–page opinion containing 157 findings of fact and 25 conclusions of law, the trial court concluded that Selfspot failed to meet its burden to show that Schneider Y's fitness center and related programming were unrelated to an approved charitable purpose. Crediting much of the evidence presented by the Butler Y, the trial court was satisfied that the evidence demonstrated that the fitness center was, *in fact,* (not just in theory) "intertwined" with all of the other fitness related facilities including the swimming pool and the gymnasium, and genuinely related to the charitable purpose of promoting health stated in the Butler Y's Charter and governing legal documents. The trial court also concluded that the Schneider Y's fitness center is related to the charitable purpose stated in Section 5(b)(6) of the Act, 10 P.S. § 375(b)(6), of "accomplishment of a purpose which is recognized as important and beneficial to the public and which advances social, moral, or physical objectives."

The trial court specifically rejected Selfspot's attempts to show that the Schneider Y did not provide charity in a meaningful and substantial manner because it did not provide "substantial financial aid":

We recognize the statistical compilations offered by Selfspot comparing the amount of financial assistance to gross revenues and donations. Even if properly before us, we agree with testimony by defense [Butler Y] witnesses that the comparison presented are not determinative, especially in our consideration of "charitable purpose." There is merit to the defense's suggestion that, if such types of data are relevant at all to our inquiry, comparison with net operating account and net resources available for assistance would be more meaningful. We have reviewed the exhibits showing the number of members receiving financial aid in relation to total membership. However, the Schneider Y's financial aid policy is reasonable and realistic relying on Department of Welfare Guidelines. The bar is not artificially raised to reduce the number of applicants qualifying for assistance. Given the Schneider Y's open admission policy, the publicizing of the availability of financial aid, the fact that all who've shown need receive assistance, the evidence of the amounts awarded, and the importance of comparison with net available resources, we are not persuaded that insubstantial assistance has been shown.

Trial Court Opinion, June 12, 2008, at 52–53.

The trial court also weighed heavily the fact that the fitness center, along with the entire facility, was used regularly and substantially by numerous groups, clubs, community organizations and charities, often without charge or just a nominal fee. Because Selfspot did not carry its burden of proving by a preponderance of the evidence that operation of the Schneider Y's fitness center was unrelated to its charitable purpose, the trial court dismissed the complaint in its entirety.

On appeal, Selfspot argues that it met its burden and proved that the Schneider Y's fitness center was unrelated to its charitable purpose. Specifically, it proved the Schneider Y's fitness center catered primarily to paying customers and that a significant number of its members used the Schneider Y as a health club. It claims that it proved that the vast majority of Schneider Y members were paying customers who received no financial aid. It construes *Selfspot I* and *Selfspot II* to mean that the single most decisive factor in this unfair competition case was whether the Schneider Y provided substantial financial aid. At trial, Selfspot spent considerable effort and time on proving the percentage of members who received financial aid as opposed to those who did not.

However, to the contrary, *Selfspot I* and *Selfspot II* did not hold that a YMCA does not advance a charitable purpose "unless" it provides a substantial amount of financial aid. This is a far too narrow reading of those cases and promotes a result that was not intended. Rather, these decisions stand for the proposition that if it a YMCA fitness center is used exclusively by dues-paying members (a determination which can be shown by proving that the YMCA does not provide a substantial amount of financial aid), *and that the fitness center does not exist for any purpose other than to serve those dues-paying members,* then it may not serve a charitable purpose. The percentage of members receiving financial aid is not necessarily determinative of whether a YMCA is advancing a charitable purpose. Other factors are relevant. In a situation such as this the inquiry must encompass whether, and to what extent, the fitness center exists to benefit the public. If a YMCA does not serve the public by offering its facilities and programs to community organizations, groups, schools, and the public in general, but ex-

ists only for the benefit of dues-paying members, then the charitable purpose is not met. Here, despite the fact that more dues-paying members use the fitness center than members who receive financial aid, the evidence overwhelmingly demonstrated that the funds received by the dues-paying members were reinvested into the YMCA, subsidized the members who could not afford the dues, and made the facility, including the fitness center, available for the public's overall benefit. This is not just a fitness club where adults pay a fee to work out on fitness equipment. Unlike the Fitness Factory, the Schneider Y's fitness center was used by a juvenile home, community organizations, schools and other groups.

No Pennsylvania case, including *Selfspot I* and the unpublished decision in *Selfspot II*, has held that a charitable purpose can *only* be advanced by giving something away. This is not, and has never been the definition of charitable purpose and, it is, in fact, directly contrary to established case law that providing services for some fee does not negate the charitable nature of the activity. In fact, many cases have held that charity, in law, is not confined to the relief of poverty or distress. Rather, a charity is a gift to the general public use which extends to the rich as well as to the poor. A purely public charity does not cease to be such where it receives some payment for its services. *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968). As one Illinois court aptly explained:

*'Charity,' in law, is not confined to the relief of poverty or distress* or to mere almsgiving, but embraces the improvement and promotion of the happiness of man. *A charity is a gift to the general public use which extends to the rich as well as to the poor.* The principal and distinctive features of a charitable

organization are that it has no capital stock and no provision for making dividends or profits for private gain. It derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in its charter. The charitable nature of an organization depends upon whether its object is to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage. *An institution does not lose its charitable character by reason of the fact that the recipients of its benefits who are able to pay are required to do so, where no profit is made by the institution and the amounts so received are applied in furthering its charitable purposes and those benefits are refused to none on account of inability to pay therefore. The reason for exemptions in favor of charitable institutions is the benefit conferred upon the public by them, and a consequent relief, to some extent, of the burden upon the state to care for and advance the interests of its citizens.*

*People v. YMCA of Chicago*, 365 Ill. 118, 6 N.E.2d 166 (1937).

As noted, the *Selfspot I* decision was based on *City of Pittsburgh* and *Appeal of Sewickley Valley YMCA*. In those cases, the fitness areas were challenged as being unrelated to a "charitable purpose."

In *City of Pittsburgh*, the City of Pittsburgh challenged a tax exemption granted to the newly expanded Downtown YMCA. The City argued that the Downtown Y did not advance a "charitable purpose" because it did not devote a substantial portion of its assets to the general public but primarily existed to provide facilities and services to its dues-paying members. The trial court agreed with the City and denied the exemption. On appeal, this Court specifically stated that it was not troubled by the fact that the Downtown YMCA charged fees to some members that may approximate or exceed costs. It recognized that a YMCA may not remain entirely dependent on contributions and nominal fees and "be expected to survive financially." *City of Pittsburgh*, 564 A.2d at 1030.

Rather, the relevant focus was on *who* benefited from the fitness center. Was it only available and used by dues-paying members, or was it also available for the use, enjoyment and benefit of the entire community, outside organizations, and institutions? Because there was substantial evidence that the Downtown YMCA was available to non-members, including various sports leagues, swimming programs, day camps, educational programs, programs for the handicapped and other community groups, this Court remanded to the trial court to consider that evidence. Based on the "sheer volume of use generated" by these other organizations, this Court could not conclude that substantial evidence supported the trial court's finding that the Downtown YMCA did not advance a charitable purpose. *City of Pittsburgh*, 564 A.2d at 1031.

Similarly, in determining whether the Sewickley YMCA advanced a "charitable purpose," this Court refused, in *Appeal of Sewickley Valley YMCA*, to focus solely on the percentage of YMCA members who were given reduced or free memberships. The Court looked instead to the extent to which the Sewickley YMCA made its facilities available to the public and community "regardless of the participant's membership status." *Appeal of Sewickley Valley*, 774 A.2d at 7. In that case, there was substantial evidence that the Sewickley YMCA sponsored many community services and programs that were not part of the traditional membership. It allowed several school districts to use its swimming

pools and activity fields. It sponsored health fairs for adults and children, free of charge, to anyone in the community.

■ In the case of a YMCA the facts must be scrutinized to determine why it exists and for whose benefit it inures. If the YMCA is available to the community as a whole and organizations, clubs, groups, schools, hospitals have access to it and use it, even though the majority of its members pay dues, it still serves a charitable purpose. *City of Pittsburgh,* Appeal of Sewickley Valley.

■ So, contrary to Selfspot, whether the Schneider Y provided "substantial financial assistance" was not the *only* relevant factor the trial court was required to consider. Providing a fitness facility exclusively to affluent members may very well be *unrelated* to the Y's charitable purpose if that is, in fact, the only purpose for which that YMCA exists. However, the trial court was instructed on remand to consider the "precise nature and extent of the uses [of the fitness center]" which it painstakingly did. The trial court concluded that the fitness center and programs at the Schneider Y do, in fact, accomplish a purpose which was recognized as important and beneficial to the public. The question for this Court is whether that finding was supported by substantial evidence.[5]

Based on a careful review of the record, this Court agrees that the Schneider Y's fitness center was "related to its charitable purpose." The evidence in no way established that the fitness area of the Schneider Y operated as a private health club *only* available to select users who paid dues. Quite to the contrary, the record clearly established that the Butler Y's primary objective was charitable and provided a beneficial service *to the community,* not to make a profit. The Schneider Y offered its services and programs to the public at large. No activity was restricted to paying members only. The Schneider Y did not refuse use of its facility or programs to any person because of inability to pay. It offered scholarships and financial assistance to those applicants for whom payment would be a hardship.

Even if a "substantial" number of patrons paid for memberships, this does not negate the charitable character of the activity. The undisputed evidence shows that the Schneider Y provided an important and beneficial full service YMCA to the public and that the doors to the Schneider Y were open to all, regardless of ability to pay. The fact that the Schneider Y is located in an affluent area is not indicative of a profit motive and it did not render the facility "unrelated" to its charitable purpose.[6] The facts established that the services and programs offered at the

---

5. In reviewing a verdict of a judge without a jury the appellate court must determine whether the findings of the trial court are supported by competent evidence and whether the trial judge committed error of law. The findings of the trial judge must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed absent error of law or abuse of discretion. *M & D Properties, Inc. v. Borough of Port Vue,* 893 A.2d 858 (Pa.Cmwlth.2006).

6. If this Court accepted Selfspot's argument, a YMCA could never be established in an

affluent area which, in turn, would mean that autistic children, mentally challenged and troubled children from these areas, would not have the benefit of a facility like the Schneider Y, which provided innumerable opportunities for such children to be active and participate in programs and activities in a community and family oriented environment. In addition, hospitals, churches, schools and other groups and organizations which happen to be situated in such an area would not have the benefit of the array of health and fitness facilities.

Schneider Y were humanitarian in nature and rendered for the general improvement and betterment of the community. By letter of October 23, 2007, the Butler County Board of Commissioners formally requested the YMCA's continued presence in Cranberry Township and expressed its opinion that the Schneider Y "enhances the Cranberry Township community and the County of Butler."

The trial court adequately considered and disposed of this issue in favor of the Schneider Y after it thoughtfully and thoroughly considered the evidence. Specifically, the trial court found that "there is insufficient evidence that significant numbers of members use the Schneider Y primarily as a fitness center." Trial Court Opinion at 49. The trial court also found that "the high percentage of member utilization and heavy volume reflects demand and a greater need for the Schneider Y to provide this service for the benefit of the citizens of Butler." Trial Court Opinion at 50. Finally, the trial court specifically held that there was "insufficient evidence that the Schneider Y caters to paying customers." Trial Court Opinion at 50. The trial court also reviewed the voluminous exhibits and testimony concerning the number of members who received financial aid in relationship to total membership and concluded that the Schneider Y's financial aid policy was reasonable and realistic. The trial court's verdict and findings must be given the same weight and effect on appeal as a verdict of a jury and should not be disturbed absent error of law or abuse of discretion. *M & D Properties.*

Selfspot asks this Court to look at the Schneider Y's fitness center as though it was a stand alone health club, separate from the rest of the facility. It asks the Court to observe that the only persons coming in and out of that "health club" facility were dues-paying members. It has assumed that the only reason these members went to the Schneider Y was to access the "health club," not to go to the swimming pool or gymnasium to participate in any of the multitude of programs offered at the Y. The picture that Selfspot attempts to paint is not the reality that was borne out by the evidence. The evidence accepted as credible by the trier of fact demonstrated that the fitness center was absolutely integral and vital and available to everyone. The evidence showed that there was no distinction between the fitness center and other facilities regarding eligibility for membership. Anyone had access to the fitness center at the Schneider Y in the same manner as everyone else, whether that person was a full-dues paying member, a financial assistant applicant, a patient at the non-profit Butler Health System facility, or a member of a community group that had an arrangement with the Schneider Y. It was not a separate business being unfairly conducted in competition with the Fitness Factory.

Although this Court is not required to follow the decisions of other courts as precedential, the decision in *Clubs of Cal. for Fair Competition v. Kroger,* 7 Cal. App.4th 709, 9 Cal.Rptr.2d 247 (1992) is instructive. There, Clubs of California for Fair Competition, a non-profit group of fitness club owners, challenged the property tax exemption granted to the YMCA of Oakland. In October 1986, the YMCA opened a new facility in Oakland, California which replaced an older building four blocks away. The new facility consisted of a swimming pool, basketball courts, volleyball courts, racquetball courts, a state-of-the-art weight room, a cardiovascular room with various exercise machines, and a Nautilus equipment room. The YMCA offered fitness programs and classes including aerobic classes, a stretch-and-flex class for older patrons, classes in strength training, yoga, aquatic fitness, group walks in the

neighborhood, various running activities, a biking program, and dance lessons.

The improved facility attracted new members. Soon, most of the YMCA's patrons were adults paying substantial membership fees to participate in athletic, physical fitness and wellness activities. In 1989, the YMCA had approved reduced fees or fee waivers for about 18 percent of the membership. Clubs argued that the primary activity of the new facility had become that of "a health club for affluent adults" in competition with other commercial health clubs, which no longer qualified for tax exemption. *Clubs of Cal.,* 9 Cal. Rptr.2d at 249.

One of the issues was whether the fitness center should be considered separately or whether the YMCA should be analyzed as an integral unit. The California Court of Appeals noted that some programs concerned a more vital social interest than others but observed that all the YMCA's activities and programs interacted with each other in a synergistic manner.

> *The record instead favors analyzing the YMCA as an integral unit.* We note that it would generally be very difficult to separate a particular category of adult activity from other clearly charitable activities. *All the activities are conducted in the same building; activities with varying claims to the exemption share the same rooms and equipment. The activities are directed by the same staff, and they often share the same sources of financial support and the same overhead costs.* Moreover, the record provides no compelling reason to attempt to distinguish between the programs. *All the YMCA activities we have discussed have some potentially valid charitable purpose although some activities may concern a more vital social interest*

> *than others. Similarly, no activity caters merely to a closed group of dues-paying members although some activities, particularly those offered to the youth, display more community outreach than others. It cannot be doubted that programs tend to interact with others in a synergistic manner. The success of one activity may help promote another as participants gain friends and learn of what the YMCA has to offer. A large membership in town makes possible a greater variety of programs.* The YMCA will tend to succeed or fail as a complex of related activities, rather than as a collection of discrete programs.

*Clubs of Cal.,* 9 Cal.Rptr.2d at 254 (Emphasis added).

Viewing the new Oakland YMCA as a single complex and giving appropriate weight to its youth programs, the court held that it served a "charitable purpose."

Here, like the Oakland YMCA in *Clubs of Cal,* the Schneider Y is a community facility which, aside from the fitness center, provides a myriad of community and social oriented programs including childcare facilities, day camps, after school child care, a child recreation center, youth weight training programs, senior strengthening and fitness programs, a Big Brothers/Big Sisters program, a Healthy Kids Day program, and community all purpose rooms. The Schneider Y's fitness facilities are also used by local schools, the Active Aid America program in connection with the United States Center for Disease Control, a homeschoolers physical education program, the Glade Run Lutheran Home for troubled youth, high school prom functions, the Butler County Autism Society, and the Slippery Rock University Circle of Friends for autistic children and others with disabilities, and the Boy Scouts and Girl Scouts of America.

Selfspot failed to demonstrate that the Schneider Y operated its fitness center like a private health club, like The Fitness Factory which caters *exclusively* to paying members. The evidence demonstrated that this was not the case. Although the evidence showed that the majority of members paid dues, the fact remains, the Schneider Y facility, including the fitness center, is accessible and used considerably and substantially by numerous schools, groups and organizations which utilized all parts of the facility on a daily basis.

Accordingly, this Court agrees with the trial court's conclusion that the fitness programs at the Schneider Y accomplished a purpose which was recognized as important and beneficial to the public and that the fitness center was related to a charitable purpose of the Schneider Y within the meaning of Section 8(b) of the Act, 10 P.S. § 375(b).

The trial court's order which dismissed Selfspot's complaint is affirmed.[7]

### ORDER

AND NOW, this 5th day of January, 2010, the Order of the Court of Common Pleas of Butler County in the above-captioned case is hereby affirmed.

---

7. Because this Court has concluded that the Schneider Y's fitness center was not "unrelated" to its charitable purpose based on the single fact that it has more dues-paying members than members who receive financial aid, it is unnecessary to address Selfspot's remaining arguments pertaining to the "reasonableness" and practicality of Butler Y's financial aid policy which followed the Department of Welfare's guidelines.